# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

**NANCY DODGE** *et al.*,

    **Plaintiffs,**

  v.

**MIRANT MID-ATLANTIC, LLC,** *et al.*,

    **Defendants.**

**Civil Action No. AW-09-1686**

## MEMORANDUM OPINION

Plaintiffs Nancy Dodge and Norton Dodge ("the Dodges"), David Bookbinder, Chris Schmitthenner, and the Chesapeake Climate Action Network ("CCAN"), filed this case against Defendants Mirant Mid-Atlantic, LLC ("Mirant Mid-Atlantic") and Mirant Chalk Point, LLC ("Mirant Chalk Point") on June 26, 2009, for alleged violations of the Clean Air Act, 42 U.S.C. §§ 7601-7671(q) (2006), and its implementing federal and state regulations at the Chalk Point Power Plant ("Chalk Point" or "Chalk Point Facility") located in Prince George's County in designated "Area IV." Currently pending before the Court is Defendants' Motion to Dismiss or, in the Alternative, to Refer to the Maryland Department of the Environment (Doc. No. 19). The Court has reviewed the entire record with respect to the instant motion. The issues have been briefed and the Court does not believe a hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated below, the Court will GRANT Defendants' Motion to Dismiss and DENY Defendants' alternative Motion to Refer the case.

**I. FACTUAL AND STATUTORY BACKGROUND**

Mirant Chalk Point is an energy generating plant located in Prince George's County, Maryland. Two of its oil and natural gas-fired boilers are the subject of this lawsuit—Emissions

Unit E-3, which came into operation in 1975, and Emissions Unit E-4, which was placed in service in 1981. These units burn residual fuels for at least part of the year.

As an energy production facility, Mirant Chalk Point is subject to the Clean Air Act ("CAA"), 42 U.S.C. §§ 7601-7671(q) (2006). The CAA authorizes the Environmental Protection Agency ("EPA") to set air quality standards that each state must in turn develop a plan to enforce. "Following the promulgation of the[] [EPA] standards, Maryland adopted and the EPA approved a Maryland [State Implementation Plan "SIP"] which is published in the Code of Maryland Regulations (COMAR) and in the Code of Federal Regulations." *Maryland Waste Coalition v. SCM Corp.*, 616 F. Supp. 1474, 1476-1477 (D. Md. 1985) (citing COMAR 190.18.06; 40 C.F.R. Subpart V §§ 52.1070-52.1117).

The Maryland SIP prohibits "the discharge of particulate matter in amounts greater than [0.02] grains per dry standard cubic foot of exhaust gas," in equipment burning residual oil, *id.*; COMAR 26.11.09.06 (the "particulate matter standard"), and also requires installation of a dust collector in emissions units burning residual fuel (the "dust collector requirement"), *id.*; prohibits burning of "fuel with a sulfur content by weight in excess of or which otherwise exceeds" one percent, COMAR 26.11.09.07 (the "sulfuric acid standard"); and also prohibits "discharge of emissions from any fuel burning equipment, other than water in an uncombined form, which is greater than 20 percent opacity." COMAR 26.11.09.05 (the "visible emission standard").

To resolve an enforcement proceeding, the Maryland Department of the Environment ("MDE") (then known as the Maryland State Department of Health and Mental Hygiene) and PEPCO, Mirant Chalk Point's predecessor, entered a Secretarial Order (by consent) dated July 19, 1979, and approved by the EPA as an SIP revision providing Emissions Unit E-3 with a

waiver from compliance with the dust-collector device requirement. The parties entered a similar consent order controlling the applicable particulate matter standard and particulate matter control equipment requirement to be enforced at Emissions Units E-3 and E-4 in 1992, and this Order excused these Units from installing dust collectors so long as they did not exceed the stipulated emissions limit. The Order also included a requirement that PEPCO conduct stack testing on Units E-3 and E-4 every other year. In May 2003 MDE and Mirant Chalk Point entered into another consent order to resolve an enforcement proceeding for an alleged 2002 particulate matter emissions violation in Emissions Unit E-4. For that violation, MDE imposed a $20,000 fine on Mirant Chalk Point.

Most recently, on September 11, 2006, MDE and Mirant Chalk Point entered into a Consent Decree Order ("2006 Consent Decree"), which the MDE had submitted to the Circuit Court for Prince George's County, Maryland, contemporaneously with MDE's enforcement proceedings against Mirant Chalk Point for opacity exceedances in violation of the visible emissions standard, COMAR 26.11.09.05. This 2006 Decree voided the entire 1979 Secretarial Order, including the waiver provision for Emissions Units E-3 and E-4, and established new emissions standards. The 2006 Decree is currently in force, and the Circuit Court for Prince George's County, Maryland has continuing jurisdiction.

On August 30, 2006, four citizens groups, including CCAN, sued Mirant Chalk Point and Mirant in this Court for violations of federal and state opacity standards at the Chalk Point Facility. Judge Motz dismissed the case for lack of subject matter jurisdiction, finding that the MDE was already diligently prosecuting the alleged CAA visible emissions standard violations at Chalk Point and that the 2006 Decree adequately addressed these issues. *Envtl. Integrity*

3

*Project v. Mirant Corp.*, No. 06-2249, 2007 U.S. Dist. LEXIS 1219, at *1-2 (D. Md. Jan. 3, 2007).

Plaintiffs brought this one-count Complaint on June 26, 2009, alleging that Defendants emit excessive particulates in violation of the particulate matter emissions standards and the dust collector requirement,[1] because they have "repeatedly burned dirty, less expensive residual fuel oil in Emissions Units E-3 and E-4 . . . without legally required pollution controls to limit harmful particulate matter pollution." (Compl. ¶ 2.) Plaintiffs seek injunctive relief prohibiting Defendants from operating Emissions Units E-3 and E-4 at least until they install adequate particulate matter pollution controls or use a cleaner fuel such as natural gas or distillate oil; declaratory relief; civil penalties of up to $32,500 per day for each CAA violation; and an award of costs of litigation. Defendants have moved to dismiss under 12(b)(1) and 12(b)(6), and move in the in the alternative, to refer the case to the MDE.

## II. STANDARD OF REVIEW

Defendants move to dismiss under both 12(b)(1) and 12(b)(6). The burden of proving that the court has subject matter jurisdiction rests with the plaintiff. *See Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac*

---

[1] The dust collector device requirement provides:
    A person may not cause or permit the combustion of residual fuel oil in fuel burning equipment unless the equipment is fitted with a dust collector which is so designed that it can reasonably be expected to produce sufficient dust particle force, residence time, and particle retention to satisfy the requirements of Table 1. This paragraph does not apply to fuel burning equipment where by-product gases or by-product gases in

4

*R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In two recent cases, the United States Supreme Court clarified the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Those cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (2007). That showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In its determination, the Court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

### III. ANALYSIS

Defendants first move to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) and

---

combination with residual fuel oil are burned and where the effluent gases do not contain particulate matter in excess of the requirements of Table 1, as applicable to residual oil burning.

12(b)(6) on the grounds that this Court lacks subject matter jurisdiction because MDE continues to diligently prosecute the alleged violations of the CAA particulate matter emission standard and dust collector requirement, and because the suit is barred by the doctrine of res judicata. Next, Defendants move in the alternative for the Court to refer the case to the MDE for review on the ground that the MDE has primary and ongoing jurisdiction over directing specific modes of compliance with environmental standards. Additionally, Defendants move to dismiss as a party Defendant Mirant Mid-Atlantic, LLC, parent company of the owner of Chalk Point Units 3 and 4 on the basis that Plaintiffs fail to plead facts sufficient to allow this Court to pierce the corporate veil. Next, Defendants move to dismiss Plaintiffs Nancy and Norton Dodge and Chris Schmitthenner on the ground that the Court lacks subject matter jurisdiction over them because they did not notify Defendants of their intent to sue. Finally, Defendants move to dismiss Plaintiff Chesapeake Climate Action Network on the ground that it lacks standing since it did not identify a member in the Complaint with a claim of particularized injury. The Court finds that Mirant Mid-Atlantic, LLC cannot be dismissed at this stage, that the Dodges and Chris Schmitthenner must be dismissed for failure to satisfy the notice provision of the CAA, and that CCAN has standing in this case. The Court believes that Plaintiffs have not met their burden of showing that the MDE has not diligently prosecuted the particulate matter emission regulation and dust collector requirements, and thus dismisses the case for lack of subject matter jurisdiction. The Court also finds that this case is not barred by res judicata, and that the CAA does not allow this Court to refer the case to the MDE in this circumstance.

### a. Norton and Nancy Dodge and Chris Schmitthenner

The Court finds that Norton Dodge, Nancy Dodge, and Chris Schmitthenner must be dismissed from the suit for failure to comply with the CAA's pre-suit notice provisions, 42 U.S.C. § 7604(b)(1), and EPA's regulation, 40 C.F.R. § 54.3. The CAA's notice provisions provide in part, "[n]o action may be commenced . . . prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . ." The EPA regulation requires that notices provide "the full name and address of the person giving the notice." 40 C.F.R. § 54.3. Under Supreme Court and Fourth Circuit precedent, the notice provisions are "'mandatory conditions precedent to commencing suit' and may not be avoided by employing a 'flexible or pragmatic' construction." *Monongahela Power Co. v. Reilly*, 980 F.2d 272, 275 n. 2 (4th Cir. 1993) (citing *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989)). The Supreme Court has described Congress's intent in enacting the provision as, "to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts. . . [by] allow[ing] Government agencies to take responsibility for enforcing environmental regulations . . . [and] giv[ing] the alleged violator an opportunity to bring itself into complete compliance with the Act . . . ." *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989).

Here, while CCAN, the EIP, and David Bookbinder sent a combined notice letter in compliance with the notice provisions, Defendants had no notice of the participation of Nancy and Norton Dodge and Chris Schmitthenner in the suit until this Complaint was filed. Plaintiffs argue that the plain language of the CAA and the EPA's regulation requires notice by only a

7

single plaintiff. But, this Court's decision in *Cambridge Envtl. Health & Dev. Group v. City of Cambridge*, 115 F. Supp. 2d 550, 558 (D. Md. 2000), clearly rejects that interpretation of the text of the CAA notice provision, instead finding that the failure of the twenty-seven individual plaintiffs in that case to provide notice of intent to sue deprived the court of subject matter jurisdiction over those plaintiffs. The plaintiffs in that case argued that other plaintiffs in the case had provided notice that indicated that individuals might join the suit, and that the defendant in that case was not actually willing to negotiate a resolution, but the Court found those contentions "immaterial in light of the Fourth Circuit's strict interpretation of the notice requirement." *City of Cambridge*, 115 F. Supp. 2d at 559. Plaintiffs' attempt to distinguish *Cambridge* on the ground that only three plaintiffs would be added here, whereas twenty-seven sought to be added in *Cambridge* is unsuccessful in light of the *Cambridge* court's rationale of strictly adhering to the Fourth Circuit's interpretation of the CAA, rather than assessing the likelihood of the added plaintiffs changing the defendant's attitude toward negotiation. Though Plaintiffs' interpretation is in keeping with the federal district court for the Eastern District of North Carolina's decision in *Water Keeper Alliance v. Smithfield Foods, Inc.*, No. 4:01-CV-27-H(3), 2002 U.S. Dist. LEXIS 27973 (E.D.N.C. May 20, 2002) ("neither the statute nor regulations governing citizen notice requirements expressly require that *all* plaintiffs participate in the notice process"), this Court declines to follow an unpublished decision from another court over the clear and well reasoned precedent established in a published case from this Court. Nor does the Court find applicable the test Plaintiffs cite from *Water Keeper Alliance* as that court used that test to determine if substitution of a party was appropriate, not to determine whether addition of a party was appropriate. Indeed, no such test exists as the law is clear that notice is a mandatory

prerequisite to suit under the CAA. Similarly, the Dodges' and Schmitthenner's status as CCAN members does not constitute notice under the CAA as there is no precedent for concluding that notice by an organization constitutes notice on behalf of each of its members as individuals.

### b. Mirant Mid-Atlantic, LLC

Defendants move to dismiss Mirant Mid-Atlantic, LLC from the Complaint on the ground that Plaintiffs have not adequately alleged the elements necessary for the Court to pierce the corporate veil and hold Mirant Mid-Atlantic, LLC ("Mirant Mid-Atlantic") vicariously liable for the acts of its subsidiary Mirant Chalk-Point, LLC ("Mirant Chalk Point"). Plaintiffs respond that dismissal of Mirant Mid-Atlantic at this stage would be premature as Plaintiffs intend to pinpoint the specific role Mirant Mid-Atlantic had in the violations and determine Mirant Mid-Atlantic's specific involvement through discovery. (Doc. No. 23 at 18.) The Court believes that Plaintiffs meet the pleading standard under Rule 8.

Plaintiffs plead that Mirant Chalk Point is a "wholly-owned subsidiary of Mirant Mid-Atlantic," and that the two companies are "affiliated" and "have common management." (Compl. ¶ 19). The Complaint also states that Mirant Mid-Atlantic, along with Mirant Chalk-Point "own[s] and operate[s] the Chalk Point Power Plant." (Compl. ¶¶ 19, 33.) The Court finds that Plaintiffs' allegations are sufficient at the pleading stage to keep Defendant Mirant Mid-Atlantic in the suit. Defendants claim that the Complaint's acknowledgment that the 2006 Consent Decree is solely between the MDE and Mirant Chalk Point (Compl. ¶ 29; *Id.*, Ex. C), and the statement in the attached Multipollutant Emissions Control Study that Mirant Chalk-Point is the owner of the Chalk Point facility (Compl., Ex. F) constitutes an admission that Mirant Mid-Atlantic is not the owner of Chalk Point. But, the Court does not believe the statement by this

third party can negate Plaintiffs' assertion to the contrary, and nor does the fact that the 2006 Consent Decree is between MDE and Mirant Chalk Point necessarily exclude the possibility that Mirant Mid-Atlantic is now an owner. Accordingly, the Court will not dismiss Mirant Mid-Atlantic at this time.

### c. Chesapeake Climate Action Network's Standing

The Court believes CCAN's allegations of injury are sufficient to survive Defendants' Motion to Dismiss. CCAN alleges, "CCAN members are exposed to harmful air pollution as a direct result of Defendants' illegal air emissions . . . and such exposure has caused and is causing actual and/or threatened injury to these members' health, recreational, aesthetic or other interests." (Compl. ¶ 15.) Here, Defendants contend that Plaintiffs' pleading is deficient with respect to CCAN as CCAN does not allege that any single member has experienced specific injury. Plaintiffs respond that at the pleading stage, CCAN need only allege "that the defendant's actions have disturbed one of their member's ability to use and enjoy the environment." (Doc. No. 23 at 22.) The Court agrees.

"To satisfy the standing requirement of the case-or-controversy limitation on judicial authority found in Article III, Section 2 of the Constitution, the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Indeed, the Supreme Court has found, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and

10

recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc., v. Laidlaw Envtl Servs.*, 538 U.S. 167, 183 (2000). The Court finds the Plaintiffs' allegations of injuries sufficient to establish "injury in fact" such that it is guaranteed that CCAN has a "stake in the outcome of [the] dispute to render judicial resolution of it appropriate." *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 298 (4th Cir. 2005) (internal quotations omitted). Accordingly, the Court will not dismiss CCAN from the suit.

### d. Diligent Prosecution

The CAA's citizen suit provision states that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated . . . an emission standard or limitation under this Act or [] an order issued by the Administrator or a State with respect to such a standard or limitation, [or] [] against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator," 42 U.S.C. § 7604(a)(1), after the citizen meets the Act's notice requirements. *Id.* § 7604(b)(1)(A). A citizen suit may not be commenced, however, if the administrator or the state already 'has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance." *Id.* § 7604(b)(1)(B). "The citizen suit is meant to supplement rather than to supplant government action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987). "Congress authorized citizens' suits to allow private citizens to act when 'the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Clean Air Council v. Sunoco, Inc.*, No. 02-1553, 2003 U.S. Dist. LEXIS 5346, at *7-9 (D. Del. Apr. 2, 2003) (quoting S. Rep. No. 92-414, at 64 (1971)). "[D]iligence on the part of the enforcement agency is presumed." *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs.*, 890 F. Supp. 470, 487 (D.S.C. 1995). "The plaintiff bears the burden of overcoming this heavy presumption by offering 'persuasive evidence that the state has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith.'" *Envtl. Integrity Project v. Mirant Corp.*, No. 06-2249, 2007 U.S. Dist. LEXIS 1219, at *1 (D. Md. Jan. 3, 2007) (quoting *Laidlaw Envtl. Servs.*, 890 F. Supp. at 487).

Defendants maintain, in support of their motion to dismiss, that the MDE is already diligently prosecuting the particulate emissions and dust collector requirements, and thus any citizen suit for violation of these standards is precluded. Defendants argue that though the 2006 Decree was prompted by MDE's enforcement action of the visible emissions standard, the result is a tightening of both the opacity and particulate matter limitations, because the two limitations are intertwined. (Doc. No. 19 at 14.) Defendants also contend that the dust collector requirement is subsumed in the particulate matter standard since reduction of emissions is the purpose of the dust collector requirement, and that the 1979 Order nullified the dust collector requirement. Plaintiffs respond that neither the MDE nor the EPA have "diligently prosecuted" the violations of the dust collector requirement as the enforcement proceedings that resulted in the 2006 Decree addressed only the visible emissions limitation, and not the dust collector requirement which Plaintiffs now address. The Court believes that Plaintiffs have failed to show that the MDE is not diligently prosecuting the particulate matter emissions standard and dust collector requirement. Defendants' position is consistent with the high level of deference that the Court must give the MDE in its prosecution of claims arising under the Act. *See Piney Run Pres. Ass'n v. County Comm'rs*, 523 F.3d 453, 460 (4th Cir. 2008) (interpreting citizen suit provision of CWA). Next,

though the enforcement proceeding resulting in the 2006 Consent Decree did not arise under the dust collector requirement, the 2006 Consent Decree regulates particulate matter and control technology, the areas under which the dust collector requirement falls, and is consistent with how the MDE has regulated Emissions Units E-3 and E-4 in the past. Because the 2006 Consent Decree regulates particulate matter emissions and technology control mechanisms, the Court finds that Plaintiffs have not met their burden of showing lack of diligent prosecution.

As a preliminary matter, the Court addresses Plaintiffs' contention that claims should not be precluded when the prior enforcement proceeding is brought under different standards or regulations. In *Maryland Waste Coalition v. SCM Corp.*, the court provided, "[i]n a situation where a single emission source violates multiple standards, limitations or orders, it would defeat the purpose of the citizen suit provision to hold that EPA's enforcement of a single standard against the emission source would bar private enforcement of other standards, limitations or orders applicable to the same emission source." *Maryland Waste Coal. v. SCM Corp.*, 616 F. Supp. 1474, 1483 (D. Md. 1985). This view is echoed in *Glazer v. Am. Ecology Envtl. Servs. Corp.*, 894 F. Supp. 1029, 1035 (E.D. Tex. 1995), a case Judge Motz cites in *Environmental Integrity Project v. Mirant Corp.*, No. 06-2249, 2007 U.S. Dist. LEXIS 1219, at *1-2 (D. Md. Jan. 3, 2007), and which provides, "[w]hen a different CAA standard, limitation, or order . . . is in controversy in the citizen suit, or [likewise] if a different activity constitut[es] the alleged violation. . . the federal court has jurisdiction over the citizen suit. To conclude otherwise would defeat the purpose of the citizen suit provision, which is to provide a mechanism for a private plaintiff to enforce the CAA." *Glazer*, 894 F. Supp. at 1035. Indeed, the parties agree that the fact that there have been enforcement actions against these same emission sources does not

preclude suits against Units E-3 and E-4 for violations of different standards. Instead the question is how to determine the scope of the previous enforcement action.

Defendants rely heavily on cases under the Clean Water Act ("CWA") which appear to be routinely brought for alleged violations of the entire permit rather than for alleged violations of specific regulations.[2] In two of the cases Defendants cite, the courts found plaintiffs failed to establish lack of diligent prosecution even though the complaints that led to the relevant consent decrees did not address the exact regulatory violations that plaintiffs then addressed. *See Piney Run Pres. Ass'n v. County Comm'rs*, 523 F.3d 453, 460 (4th Cir. 2008) (affirming district court's holding that consent decree met the diligent prosecution standard in enforcing the alleged exceedances of the thermal limitation set forth in the County's National Pollutant Discharge Elimination System ("NPDES") permit, even though it did not mandate installation of chillers as the plaintiffs preferred since before MDE's modification there had been no thermal limitation in the permit at all, and there were monetary penalties for its violation); *Cambridge Envtl. Health & Dev. Group v. City of Cambridge*, 115 F. Supp. 2d 550, 556, 558 (D. Md. 2000) (rejecting plaintiffs' contention that there was a lack of diligent prosecution of plaintiffs' claims of "violations of the conditions of the Consent Order, and violations of the Act, in that unpermitted discharges of pollutants have occurred and are continuing to occur" where "MDE's prosecution did not address, in its Complaint or in the 1993 and 1999 Consent Orders, the unlawful dry weather discharges about which the Plaintiffs complain," partly on the basis that "the 1993

---

[2] While the Court has some concerns regarding whether the CWA cases can be used as precedent on this issue of preemption, the Court finds that it is appropriate because of the similarity in language and purpose in the two statutes. "Both the Senate and House Reports explicitly connected [CWA] § 505 to the citizen suit provisions authorized by the Clean Air Act . . . the two provisions share the common central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 61-62 (1987).

Consent Order requires the City's improvements to be designed to alleviate discharges into any and all streets") (internal quotation marks omitted). These cases suggest the Court should examine the scope of the consent order to determine if the MDE has diligently prosecuted the particulate matter emissions limit and dust collector requirements.

Ultimately, the Court believes it should look at the Consent Decree to determine the scope of the enforcement action. First, Plaintiffs have not even provided the enforcement proceeding Complaint, and thus the comparison of the pleadings the *Glazer* court recommended is not possible. *See Glazer*, 894 F. Supp. at 1035 ("[i]n making this determination, a comparison of the pleadings is sufficient [as] Congress did not intend to overburden the courts by requiring protracted litigation regarding the similarities between the state's action and the citizen suit"). Additionally, the MDE apparently submitted the 2006 Consent Decree simultaneously with the Complaint, and thus there may be special relevance of the 2006 Consent Decree to determining the scope of the enforcement action. Next, the history of Emissions Units E-3 and E-4 in the consent orders from 1979, 1992, and 2006, shows the MDE has a history of regulating more standards through Consent Orders than that under which the enforcement proceeding originally arose. Finally, even Plaintiffs rely on the 2006 Consent Decree as the basis for their claim, as the 2006 Consent Decree nullifies the waiver from the dust collector requirement, which previous consent decrees had granted. Accordingly, the Court will address the scope of the 2006 Consent Decree to make its determination regarding preclusion under the CAA.

Now turning to the scope of the 2006 Consent Decree, the Court is persuaded that the 2006 Consent Decree addresses not just visible emissions, but also particulate matter emissions

and control technology so as to bar the instant suit.[3] Under the "Particulate Matter Emissions" subheading, the 2006 Consent Decree mandates submission of a plan to the MDE, including switching to natural fuels, or installing control technology, should there be noncompliance with the particulate matter emissions standard. Though the 2006 Consent Decree does not specifically mandate compliance with the particulate matter emissions requirement, as it does with the visible emissions requirement, the 2006 Consent Decree mandates stack testing to determine compliance with the particulate matter emissions requirement and mandates submission of a plan if there is a violation. Non-compliance with the particulate matter emissions standard results in monetary penalties, such as a $20,000 or $30,000 for exceedances revealed in the stack test.[4]

Next, under the "Future Control Technology Evaluation" subheading, the 2006 Consent Decree orders an evaluation of options for further reduction of emissions to be submitted to the MDE no later than January 1, 2008. This "multipollutant emissions control study required by the 2006 Consent Decree through an engineering evaluation of various emissions control technologies . . . for the control of . . . [particulate matter]" has been completed. (Compl., Ex. F at ES-1.) The Court is not persuaded by Plaintiffs' contentions that the absence of mention of the dust collector requirement, COMAR 26.11.09.06(B)(1)(a), in the "four corners" of the 2006 Consent Decree disposes of any possible argument that the 2006 Consent Decree precludes the

---

[3] Plaintiffs also argue that the Court should use contract interpretation principles in analyzing the Consent Decree. The Court believes this suggestion is reasonable and Defendants do not object. *See Berry v. Farmland Indus., Inc.*, 114 F. Supp. 2d 1150, 1157 (D. Kan. 2000) ("the court should construe a consent decree as it would a contract, such that 'the terms of the decree and the respective obligations of the parties must be found within the four corners of the consent decree.'").

[4] The 2006 Consent Decree (Doc. No. 19 ¶ 15) provides:
> In the event that Unit 3 or Unit 4 (as applicable) fails to pass the second stack test, Mirant shall evaluate the reasons for the failure, and no later than ninety (90) days following receipt of the stack test results, submit to the Department for approval, a plan to achieve compliance at the applicable unit, and no later than June 1, 2011, achieve compliance with the applicable standard through the installation of control technology, fuel switching or other measures.

present suit. The 2006 Consent Decree's references to control technology regulations encompass the dust collector technology, as that section specifically provides, "Mirant agrees to evaluate options for further reducing emissions of . . . particulate matter beyond current regulatory requirements." (Compl., Ex. C ¶ 18.)

Beyond the measures which specifically address the particulate matter emissions limitation and the dust collector requirement, some of the 2006 Consent Decree's measures intended to reduce visible emissions are in fact the same that Plaintiffs advocate to reduce particulate matter emissions. Namely, the 2006 Consent Decree requires that both Emissions Units E-3 and E-4 burn 95 percent natural gas during the "Ozone Season," which is May 1 through September 30 (approximately forty percent of the year). (Compl., Ex. C at 5-6.) If Mirant Chalk Point chooses to burn oil during this Ozone Season, then it must install "an electrostatic precipitator or other [similarly effective] particulate pollution control equipment device." (Compl., Ex. C at 6-7.) These provisions are very similar to the remedies Plaintiffs seek, though admittedly more lenient. The Court does not believe that this overlap alone is sufficient to establish diligent prosecution of the particulate emission and dust collector standard; overlapping effects do not necessarily constitute total redress of both alleged violations. But, in light of the Court's finding that those regulations are covered in the 2006 Consent Decree, the Court finds this aspect of the 2006 Consent Decree further indicates that the MDE is already diligently prosecuting the alleged violations.

Finally, Defendants contend that in the 1979 Order the MDE made a lasting interpretation that the sole purpose of the dust collector requirement is to aid compliance with the particulate matter emissions standard. This conclusion was apparently based on a PEPCO

study finding that dust collectors in Unit 3 "failed to achieve reductions in particulate emissions" compared to well-operated and maintained units without dust collectors. (Compl., Ex. B at 2.) The 1992 Order continued the exemption from the dust collector requirement for Units E-3 and E-4 if the units were compliant with the particulate matter emissions limit. (Doc. No. 19, Ex. 6 ¶ 10.) Defendants contend that the 2006 Consent Decree's undoing of Mirant's exemption from the particulate matter emissions regulation left unaltered the nullification of the dust collector requirement. The Court believes, however, that the 2006 Consent Decree's explicit cancellation of all prior orders undermines this interpretation. In the absence of any language in the 2006 Consent Decree indicating that this single aspect of the 1979 Order should remain in effect, the Court does not believe there is a reasonable basis for making such an assumption. Accordingly, the Court does not premise its finding of diligent prosecution on the MDE's interpretation of the dust collector requirement in the 1979 Order.

Additionally, the Court believes that its conclusion is consistent with the 2006 Consent Decree's caveat that "[n]othing in this Consent Decree shall be construed to alter Mirant's obligation to assure that all its installation and processes are in full compliance with all applicable air pollution control laws and regulations, except as provided herein," as the 2006 Consent Decree itself provides for regulation of the control technology. (Compl., Ex. C ¶ 33.) Because the Court believes the MDE has addressed the dust collector requirement and particulate matter emissions concerns in the 2006 Consent Decree, the Court will grant the Motion to Dismiss.[5]

---

[5] The Court will briefly address the parties' other arguments, though it is not necessary as the Court has dismissed the case. Defendants argue that Plaintiffs' claims are barred by res judicata because the identical issue of particulate pollution from the Chalk Point Facility was already litigated in *Environmental Integrity Project v. Mirant Corp.*, No. 06-2249, 2007 U.S. Dist. LEXIS 1219, at *1-2 (D. Md. Jan. 3, 2007), and the parties in the two actions are

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and deny Defendants' alternative Motion to Refer. A separate Order will follow.

   August 13, 2010                                                                                          /s/                 
                                                                                                     Alexander Williams, Jr.
                                                                                                     United States District Judge

---

integrated in interest because both cases were citizen suit cases where the plaintiffs stood for all citizens. The Court believes that the previous case merely adjudicated the issue of whether the 2006 Consent Decree covered the opacity violations, and not the issue here of whether the 2006 Consent Decree also covered particulate matter exceedances and the dust collector requirement. The Court finds the dissimilarity of issues between the cases sufficient to prevent invocation of the doctrine of res judicata. Defendants move in the alternative for the Court to refer this case to the MDE under the "primary jurisdiction doctrine" of abstention on the ground that resolution of this case will require the Court to act as a regulator and may interfere with the MDE's interpretations of regulatory standards. The Court believes that the CAA has not been interpreted to allow abstention in this case. The Court agrees with Plaintiffs that "there are no extraordinary circumstances in this case that warrant ignoring the dictates of Congress that this Court should exercise jurisdiction. To the contrary, this is a routine case under the CAA in which there is an assertion that an objective regulation has been, and continues to be, violated." (Doc. No. 23 at 14.)